IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SHAWN ROBERTSON,

    Plaintiff,                   No. CIV S-03-1712 MCE KJM P

    vs.

ANTHONY NEWLAND, et al.,        ORDER AND

    Defendants.            FINDINGS & RECOMMENDATIONS

_____/

        Plaintiff is a state prison inmate proceeding pro se with a civil rights action under 42 U.S.C. § 1983. In his complaint, plaintiff, who is African-American, alleges that while he was housed in administrative segregation at California State Prison, Solano (CSP-Sol), the classification committee assigned him to an exercise yard with Northern Hispanics and other African-Americans. Complaint (Compl.) ¶¶ 12, 18. Defendants Ledesma and Dickinson[1] assured plaintiff he could return to his previous exercise yard with Southern Hispanics, some whites and some African-Americans if he did not like his new assignment. Id. ¶¶ 14, 19.

        At his thirty day review, plaintiff asked defendant Ledesma for a reassignment to the previous yard. Id. ¶ 20. Defendant Ledesma said the yard no longer existed. Id. ¶ 21. On

---

[1] At places in the record, defendant Dickinson's name is spelled "Dickenson."

1

August 9, 2000, plaintiff asked defendant Rougeux, the chair of the classification committee, for a reassignment; this request was refused. Id. ¶¶ 22, 24.

On August 14, 2000, plaintiff was attacked by Northern Hispanics on the yard. Id. ¶¶ 23, 24. He was taken to the infirmary, where defendant Greenough determined that his left eye had been cut and would require surgery. Id. ¶¶ 25-27. Plaintiff did not reach the outside hospital for six hours after the transportation order was made. Id. ¶¶ 28, 31. Plaintiff was taken to surgery that evening, but doctors could not save his eye. Id. ¶ 33.

Defendants have filed a motion for summary judgment. Defendants Newland, Dickinson, Rougeux, Moser, Arthur and Ledesma argue that they did not violate plaintiff's Eighth Amendment rights by failing to protect him; defendant Greenough argues he did not violate plaintiff's Eighth Amendment rights while treating the injury to plaintiff's eye. Plaintiff opposes the motion.

I. Summary Judgment Standards Under Rule 56

Summary judgment is appropriate when it is demonstrated that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

> Under summary judgment practice, the moving party
> always bears the initial responsibility of informing the district court
> of the basis for its motion, and identifying those portions of "the
> pleadings, depositions, answers to interrogatories, and admissions
> on file, together with the affidavits, if any," which it believes
> demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" Id. Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that

party will bear the burden of proof at trial. See id. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

/////

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed. R. Civ. P. 56(c). The evidence of the opposing party is to be believed. See Anderson, 477 U.S. at 255. All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Matsushita, 475 U.S. at 587. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

On April 9, 2004, the court advised plaintiff of the requirements for opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure. See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc), cert. denied, 527 U.S. 1035 (1999), and Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).

II. Factual Background

On June 10, 2000, plaintiff was placed in the Administrative Segregation Unit (ASU) at CSP-Sol pending resolution of a disciplinary write-up for possession of a controlled substance. Mem. P. & A. in Supp. Mot. for Summ. J. (MSJ), Rougeux Declaration (Rougeux Decl.) ¶¶ 18-20; Deposition of Shawn Robertson (Robertson Depo.) at 6.[2] ASU is a "short-term" lock up unit; it is, in essence, a jail within the prison. Rougeux Decl. ¶ 5. Every thirty days, the Institutional Classification Committee (ICC) reviews ASU inmates to determine their classification and thus determine the most appropriate housing and custody, assess their yard

---

[2] Plaintiff's deposition, taken on June 16, 2004, has been lodged with the court.

4

1 assignments, and assure that they receive adequate time for exercise every week. Id. ¶¶ 3, 6. In
2 July 2000, assignments to yard groups were based largely on ethnicity. Id. ¶ 8.
3       When plaintiff first arrived in ASU, he was assigned to a yard with other African-
4 Americans, Caucasians and Southern Hispanics; the only group not on that yard was Northern
5 Hispanics, a group that did not share a yard with anybody else. Robertson Depo. at 17. On
6 July 14, 2000, the Northern Hispanics were placed on controlled compatible yards 1 and 2.
7 Rougeux Decl. ¶ 9.
8       On that day, the Northern Hispanics on the two yards tied the fence door with tee
9 shirts and demanded to speak to the Warden. Id. ¶ 10. Defendant Newland, who was then
10 warden of CSP-Sol, deemed this incident "likely to threaten institution security." Opposition to
11 MSJ (Opp'n), Ex. E (Newland's Response To Pl.'s Second Set Of Interrogatories) at 3, No 3.
12 Defendant Rougeux, who was then associate warden of CSP-Sol, and defendant Arthur went to
13 the yard and learned the Northern Hispanics were upset about several things, including attempts
14 by staff to forbid them from exercising in military formation and a pending change to the yard
15 schedule, proposed without their input; they "wanted to be able to determine which inmates were
16 assigned to a specific yard group." Rougeux Decl. ¶ 12; Opp'n, Ex. D (Rougeux's Response to
17 Pl.'s First Set of Interrogatories) at 4, No. 5; Opp'n, Ex. U (Def't Arthur's Response to Pl.'s First
18 Set Of Interrogatories) at 3, No. 5. There were "racial tension issue[s]" involved in this incident
19 as well. Id., Ex. V (Def't Arthur's Response to Pl.'s Second Set Of Interrogatories) at 4, No. 5.
20       The inmates remained on the yard overnight, returning to their cells the next
21 morning after administrative staff had made some concessions. Rougeux Decl. ¶¶ 13-14.
22 Defendant Arthur wrote a memorandum declaring a state of emergency at ASU buildings 9 and
23 10. Opp'n, Ex. H.
24       According to inmate Terrence Russ, also housed in ASU, he often heard gunshots
25 fired on the segregation yard at a time only Northern Hispanics were outside; he often saw
26 inmates being taken from the yard with injuries. Opp'n, Ex. N, Declaration of Terrence Russ

5

(Russ Decl.) ¶¶ 4, 5.  Violence was an on-going problem on the Northern Hispanic yard.  Opp'n, Ex. V at 4, No. 6.

As a result of the July 14 incident and because the ASU inmates were not receiving their allotted exercise periods consistently, Newland consulted with staff and decided to realign the exercise yards, with an eye toward creating "a balanced mixture of ethnicity on each of the yard groups." Rougeux Decl. ¶ 16; MSJ, Declaration of Anthony Newland (Newland Decl.) ¶¶ 1, 4-5.  Defendant Ledesma indicates that the protest showed the security problems from allowing the Northern Hispanics to remain on a yard by themselves.  Opp'n, Ex. L (Ledesma's Response To Pl.'s Second Set Of Interrogatories) ¶ 7.  To Newland's and Rougeux's knowledge, there were no warnings from staff or inmates of problems stemming from the yard change.  Newland Decl. ¶ 5, Opp'n, Ex. D at 6, No. 12.  Defendant Newland did not consider Northern Hispanic inmates dangerous to other inmates at the time of the yard reassignments.  Opp'n, Ex.  E at 5-6, No. 10.

Before the yard changes were made, the ICC evaluated each ASU inmate for yard group reassignment. Rougeux Decl. ¶ 17; MSJ, Declaration of M. Ledesma (Ledesma Decl.) ¶ 3.

On July 18, 2000, plaintiff was called to a hearing conducted by defendants Ledesma and Dickinson to assess yard reorganization.  MSJ, Declaration of K. Dickinson (Dickinson Decl.) ¶4; Ledesma Decl. ¶ 4.  The defendants reviewed plaintiff's central file and specific case factors.  Id.  Plaintiff told defendant Dickinson that he could be on the yard "with whoever," because he is "not affiliated."  Robertson Depo. at 34.  Dickinson and Ledesma asked specifically if he had a problem being on the yard with Northern Hispanics; he said no.  Id.; Dickinson Decl. ¶ 4; Ledesma Decl. ¶ 4.  Plaintiff's file did reflect the fact that he was in prison for shooting two Northern Hispanics.  Opp'n, Ex. P (CDC 114-A1–Inmate Segregation Profile); cf. id., Ex. B (Def't Dickinson's Answers to Pl.'s Second Set of Interrogatories) at 4, No. 6 (no recollection of profile's contents).

/////

1    Ledesma and Dickinson assigned plaintiff to controlled compatible yard 3;
2 plaintiff agreed with the yard change.  Ledesma Decl. ¶ 4; Dickinson Decl. ¶ 4; Robertson Depo.
3 at 41.
4    Inmate Terence Russ, also an African-American, said he also went to an ICC
5 meeting on July 18 and told defendant Ledesma that putting blacks on a yard with Northern
6 Hispanics would not work, because the black population in ASU was relatively small.  Opp'n,
7 Ex.  N (Declaration of Terence Russ) ¶¶ 9-12.
8    At first, the Northern Hispanics were on disciplinary detention and so just African
9 Americans were on the reconstituted yard.  Robertson Depo. at 43.  Eventually, however, there
10 were approximately thirty Northern Hispanics and eight African Americans on the yard.  Id. at
11 43-44.
12    Plaintiff had a thirty day classification review on August 9, 2000; the committee
13 members were Rougeux, defendant Moser, Ledesma, Sergeant Babcock and Dr. O'Connor.
14 Ledesma Decl. ¶ 7; Robertson Depo. at 46-47.  Plaintiff asked if he could go back to his old yard.
15 Id. at 49-50.  He also mentioned that he was in prison for shooting two "Northern Hispanics."
16 Opp'n, Ex. J ¶ 18 (Pl.'s Affidavit); id., Ex. O (Def't Moser's Response to Pl.'s First Set Of
17 Interrogatories) at 51, No. 12.  However, this would not necessarily raise a safety concern if
18 plaintiff's conviction was for shooting two men with Hispanic surnames in northern California
19 rather than two Northern Hispanic gang members.  Opp'n, Ex. E (Def't Newland's Response To
20 Pl.'s Second Set of Interrogatories) at 4, No. 4.
21    Ledesma told plaintiff  his old yard no longer existed, but offered him another
22 controlled compatible yard or a walk alone yard.  Robertson Depo. at 49; Rougeux Decl. ¶ 23;
23 Ledesma Decl. ¶ 7.  Ultimately, plaintiff did not agree with the decision to retain him on
24 controlled compatible yard 3, but declined both of the other options offered to him.  Rougeux
25 Decl. ¶¶ 23, 25.
26 /////

1   Defendant Ledesma does not recall why plaintiff disagreed with the decision;
2   defendant Rougeux does not recall plaintiff's informing the committed that he feared assault by
3   Northern Hispanics or that he felt his safety was in jeopardy. Ledesma Decl. ¶ 7; Rougeux Decl.
4   ¶ 26. Plaintiff says he told the committee:

> It wasn't so much that, you know, they were tripping off of us or, you know, being mean to us on the yard or anything like that. I just told her straight out. It's too many. If something happened out there, it's not going to be good for us.

Robertson Depo. at 49. Plaintiff protested that it was not safe for any African-American, because "the law of my land in prison is you cannot put 30 of nothing on a yard with five of anything else. . . . You know, it's something about prison and territorial carnivorism. . . [M]y concern was the numbers." Id. at 51. According to Rougeux, however, the administration did not know of any particular tension between Northern Hispanics and Blacks that would have prevented the two groups from exercising together. Rougeux Decl. ¶ 27. Plaintiff concedes that the two groups generally are allies in prison. Robertson Depo. at 54.

On August 14, 2000, Northern Hispanics attacked the blacks within half an hour after their arriving on the yard, around 9:00 a.m. Rougeux Decl. ¶ 28; Robertson Depo. at 91; Opp'n, Ex. J ¶ 20; id., Ex. N ¶ 16. It was during this attack that plaintiff was injured.

When plaintiff arrived in the infirmary, defendant Greenough examined plaintiff's eye, sutured one of two lacerations, provided pain medication, ordered and reviewed x-rays, arranged for specialty evaluation and care and initiated the transportation process. MSJ, Ex. A (Def't Greenough's Response to Pl.'s First Set of Interrogatories) at 5, No. 9. He treated plaintiff between 10:45 a.m. and 12:45 p.m. on August 14, 2000. Id. at 5, No. 10.

Transportation officers arrived, but then they waited and did not leave the prison until close to 5:00 p.m. Robertson Depo. at 86-87. Greenough explained that the time plaintiff waited was due to the time it took transportation staff to make the necessary arrangements to move plaintiff to an outside hospital. MSJ, Ex. A at 8, No. 16. While the transportation staff

made these arrangements, he called Doctors Hospital in Manteca to inform them of plaintiff's arrival and his need for an ophthalmologist's services. Id., Ex. B (Def't Greenough's Response To Pl.'s Second Set of Interrogatories) at 3, No. 1. Defendant Greenough believed the injury to plaintiff's eye required urgent, not emergent transportation. Id. at 4, No. 3.

The transportation officers took plaintiff to a hospital in Manteca; plaintiff claims the admitting nurse had not been informed that plaintiff was being brought in. Robertson Depo. at 88-89. Eventually, he was taken to a hospital in Modesto, because the staff at Manteca determined he needed an ophthalmologist. Opp'n, Ex. W (Doctors Hospital Transfer Form). In Modesto, he was taken almost immediately into surgery. Robertson Depo. at 91-92. The doctor told plaintiff that when the liquid leaks from a puncture in the eye, the vision goes with it. Id. Plaintiff's left eye was removed. Id. at 93; Opp'n, Ex. X (Medical Records from Doctors Medical Center in Modesto; Bates stamped page number 18).

Dr. H. Warren, an ophthalmologist, has reviewed plaintiff's medical records from CSP-Sol, Doctors Hospital Manteca, and Doctors Medical Center in Modesto. MSJ, Declaration of H. Warren, M.D. (Warren Decl.) ¶¶ 1-2. In Dr. Warren's opinion, the magnitude of the damage to plaintiff's eye, it is "medically unlikely" that plaintiff's eye could have been saved even if there had been no delay in treatment. Id. ¶ 5.

III. Failure To Protect

In Farmer v. Brennan, 511 U.S. 825, 833 (1994), the Supreme Court confirmed what the Courts of Appeal had "uniformly held:" "'prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners'" under the Eighth Amendment. A prison official is not liable, however, "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837. In other words, in order to be deliberately indifferent, a prison official must be subjectively aware of the risk. Id. at 839-40. The court continued,

> Under the test we adopt today, an Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of harm.
>
> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
>
> Nor may a prison official escape liability for deliberate indifference by showing that, while he was aware of the obvious, substantial risk to inmate safety, he did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault. The question under the Eighth Amendment is whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial 'risk of serious damage to his future health, and it does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk.

Id. at 842-43. In order to prove that an official is subjectively aware of a risk to inmate health or safety, a plaintiff inmate need not produce direct evidence of the official's knowledge; a plaintiff can rely on circumstantial evidence indicating that the official must have known about the risk. See Hope v. Pelzer, 536 U.S. 730, 738 (2002) ("We may infer the existence of this subjective state of mind from the fact that the risk of harm is obvious"); Wallis v. Baldwin, 70 F.3d 1074, 1077 (9th Cir. 1995).

The Supreme Court cautioned that a prison official "would not escape liability if the evidence showed he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist (as when a prison official is aware of a high probability of facts indicating that one prisoner has planned an attack on another but resists opportunities to obtain final confirmation) . . ." Farmer, 511 U.S. at 843 n.8. Moreover, "advance notification" is not a necessary element of an Eighth Amendment failure to protect claim. Id. at 849.

/////

/////

1  The ultimate test is whether the prison official acted reasonably in light of his
2  knowledge; if he did, he is not liable under the Eighth Amendment even if the prisoner is
3  harmed. Id. at 844.

4  The Ninth Circuit explored the nature of the duty to protect in Berg v. Kincheloe,
5  794 F.2d 457 (9th Cir. 1986). Berg claimed he had been placed in protective custody because his
6  life was in danger and that he told Marsh, a prison official, he would be in even greater danger if
7  he went to his job as a tier porter. Marsh ignored Berg's protest and sent him to work, where he
8  was beaten and raped. The Ninth Circuit reversed the district court's grant of summary judgment
9  because the pro se complaint, read liberally, stated a prima facie cause of action. The court
10 observed:

> The standard does not require that the guard or official believe to a moral certainty that one inmate intends to attack another at a given place at a time certain before that officer is obligated to take steps
>
> to present such an assault. But, on the other hand, he must have more than a mere suspicion that an attack will occur.

15 Id. at 459 (internal citation and quotation omitted).

16  Plaintiff argues that the defendants should have known that their attempts to
17 integrate the Northern Hispanics' yards would lead to violence, in light of these inmates' history
18 of violence generally and their actions on July 14 specifically. He says his own initial
19 acquiescence in the placement on the controlled compatible yard says little about his need for
20 protection because administrators did not explain the causes of the July 14 disruption to him.
21 He notes that he put the administration on notice of the danger when he expressed concerns about
22 imbalances on the yard and when he told the committee, in a last ditch effort to be moved, that
23 his commitment offense was for shooting two Northern Hispanics. Opp'n at 4-5. Defendants
24 rely primarily on the fact that plaintiff agreed with the yard change and did not thereafter inform
25 the ICC of any particular danger from his presence on controlled compatible yard 3. MSJ at 4-6.
26 /////

1     Plaintiff has shown there is a disputed issue of material fact as to defendants Newland, Moser, Dickinson, Rougeux and Ledesma.  The Northern Hispanic protest on July 14 was fueled in part, defendants Arthur and Rougeux learned, by their displeasure about potential changes to their exercise yards.  Opp'n, Ex. D at 4, No. 5; id., Ex. V at 4, No. 8.  Before the protest, the same Northern Hispanic group had been pressuring other inmates to participate in gang-type behavior.  Newland Decl. ¶2.  A report about the incident was created and facility captains and other managers were briefed about it at the warden's executive staff meeting.  Opp'n, Ex. F at 4, No. 7.  The defendants have denied that they believed that non-Hispanics would be in danger if placed on a yard with the rebellious Northern Hispanics and noted they received no warnings that integrating the yards would lead to violence.  Newland Decl. ¶ 5; Ledesma Decl. ¶ 5.  Defendants also note that Northern Hispanics and blacks were not historical enemies.  Ledesma Decl. ¶ 5.  Finally, plaintiff initially told the ICC that he had no problem with the assignment to the yard with Northern Hispanics.  Dickinson Decl. ¶ 4.

    Nevertheless, in light of the Northern Hispanics' clear displeasure upon learning of the suggested reorganization of their yard, their record of violence, and their pressure on other inmates to join them in gang activities, an issue of fact remains as to whether the risk of harm to non-Hispanics on the yard was obvious, particularly in light of unequal numbers on controlled compatible yard 3.  A reasonable jury could find that these events were the cause of the attack on plaintiff and the ultimate loss of his eye, just as the same jury could find that prison officials acted reasonably in creating integrated yards and in mixing groups with no history of enmity on the same yard.  Based on this factual conflict, defendant Newland, who reorganized the yards, and defendants Rougeux, Ledesma, Moser and Dickinson, who assigned plaintiff to the yard and confirmed his placement there in spite of his expressed unease, are not entitled to summary judgment.

    Defendant Arthur's participation is a different matter, however.  Although Arthur accompanied defendant Rougeux to the yard on July 14 and prepared the "State of Emergency"

Memorandum on July 14, 2000, there is no indication that Arthur participated in the decisions to change the ethnic mix of the yards or to place plaintiff on controlled compatible yard 3.  Plaintiff has not shown any disputed issues of fact as to whether her involvement in the events of July 14 contributed to his injury.  Summary judgment is appropriate for defendant Arthur.  Opp'n, Ex. U at 3-5, Nos. 4, 9.

IV. Qualified Immunity

Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

In Saucier v. Katz, 533 U.S. 194 (2001), the Supreme Court set forth a particular sequence of questions to be considered in determining whether qualified immunity exists. The court must consider this threshold question: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"  Id. at 201.  If no constitutional right was violated if the facts were as alleged, the inquiry ends and defendants prevail.  Id.   In this case, the court has found a constitutional violation with respect to certain defendants.

If, however,

> a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established.... 'The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'... The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted ."

Id. at 201-02 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987).  The reasonableness of a defendant's conduct is judged "against the backdrop of the law at the time of the conduct." Brosseau v. Haugen, 543 U.S. 194, 198, 125 S. Ct. 596, 599 (2004).  The defendant should not

be subject to liability if the law at that time did not clearly establish that the defendant's actions would violate the Constitution. Id.

In Brosseau, the Supreme Court emphasized that "the qualified immunity inquiry must be undertaken in light of the specific context of the case." Id. As the Ninth Circuit has explained,

> a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inferences.... Thus, a reasonable prison official understanding that he cannot recklessly disregard a substantial risk of serious harm, could know all of the facts yet mistakenly, but reasonably, perceive that the exposure in any given situation was not that high. In these circumstances, he would be entitled to qualified immunity.

Estate of Ford v. Ramirez-Palmer, 301 F.3d 1043, 1050 (9th Cir. 2002). The Ninth Circuit explained that even though the general rule of deliberate indifference had been expressed in Farmer, no authorities had "fleshed out 'at what point a risk of inmate assault becomes sufficiently substantial for Eighth Amendment purposes.'" Id. at 1051 (quoting Farmer, 511 U.S. at 834 n.3). This observation by the appellate court necessarily informs 'the dispositive question' of whether it would be clear to reasonable correctional officers that their conduct was unlawful in the circumstances that [they] confronted." Estate of Ford, 301 F.3d at 1051.

Defendants Newland and Dickinson are entitled to qualified immunity, as is defendant Ledesma insofar as Ledesma participated in the July 18 yard reassignment of plaintiff. When defendant Newland decided to realign the yards knowing of the reasons for Northern Hispanics' protest on July 14 and the more general problems of violence, he nevertheless could reasonably perceive that the danger would not be great when Northern Hispanics were placed on a yard with members of an ethnic group that was not a traditional enemy. In addition, defendant Newland averred that he had received no warnings of potential problems from the yard reorganization. He is entitled to qualified immunity.

At the July 18, 2000 ICC meeting, plaintiff told defendants Ledesma and Dickinson that he had no problem with his assignment to a yard with Northern Hispanics. Despite their awareness of the problems with the Northern Hispanics and their potential for violence, these defendants could reasonably believe the danger to plaintiff was minimal in light of his own agreement to the placement. Defendant Dickinson is entitled to qualified immunity, as is defendant Ledesma with regard to their participation in the July 18 ICC meeting.

By the August 9 review, however, plaintiff told Rougeux, Moser and Ledesma of his unease given the disparity in the numbers on the yard, asked to be returned to his own yard, and disagreed with the decision to retain him on controlled compatible yard. Coupled with the defendants' knowledge of the Northern Hispanics' grievances and their potential for violence, it should have been clear to Rougeux, Moser and Ledesma that plaintiff was in potential danger if he remained on controlled compatible yard three. These defendants thus are not entitled to qualified immunity.

V.   Medical Care

In Estelle v. Gamble, 429 U.S. 97, 106 (1976), the Supreme Court held that inadequate medical care did not constitute cruel and unusual punishment cognizable under section 1983 unless the mistreatment rose to the level of "deliberate indifference to serious medical needs." To establish deliberate indifference, plaintiff must show that defendants knew of and disregarded an excessive risk to his health or safety. Farmer v. Brennan, 511 U.S. 825, 837 (1994). A prison official must "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. The nature of a defendant's responses must be such that the defendant purposefully ignores or fails to respond to a prisoner's pain or possible medical need in order for "deliberate indifference" to be established. McGuckin v. Smith, 974 F.2d 1050, 1060 (9th Cir.1992), overruled in part on other grounds, WMX Technologies, Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir.1997). Deliberate indifference may occur when prison officials deny, delay, or intentionally interfere

1    with medical treatment, or may be demonstrated by the way in which prison officials provide
2    medical care. Id. at 1059-60.  However, a showing of merely inadvertent or even negligent
3    medical care is not enough to establish a constitutional violation. Estelle, 429 U.S. at 105-06;
4    Frost v. Agnos, 152 F.3d 1124, 1130 (9th Cir.1998).  Instead, an inmate must allege facts
5    sufficient to indicate a culpable state of mind on the part of prison officials. Wilson v. Seiter, 501
6    U.S. 294, 297-99 (1991).  Accordingly, a difference of opinion about the proper course of
7    treatment is not deliberate indifference nor does a dispute between a prisoner and prison officials
8    over the necessity for or extent of medical treatment amount to a constitutional violation. See,
9    e.g., Toguchi v. Chung, 391 F.3d 1051, 1058 (9th Cir. 2004); Sanchez v. Vild, 891 F.2d 240,
10   242 (9th Cir.1989).

11           Defendant Greenough does not dispute the lengthy delay between the injury to
12   plaintiff's eye and the ultimate consultation with and surgery by a specialist.  Instead, in support
13   of his motion for summary judgment, defendant Greenough has offered Dr. Warren's opinion
14   that because of the magnitude of the damage to plaintiff's eye, it is "medically unlikely" that
15   plaintiff's eye could have been saved even if there had been no delay in treatment.  Warren Decl.
16   ¶ 5. In response, plaintiff has provided unauthenticated portions of his medical records from
17   Doctors' Medical Center.  Fed. R. Evid. 901(a).  Even if the foundation for these records was
18   established, however, they are not sufficient to show there is a disputed issue of material fact:
19   plaintiff has not shown that defendant Greenough was qualified to treat the injury to his eye or
20   that the delay in his receiving treatment was the cause of the loss of his eye.  Nor is plaintiff's
21   hearsay account of what the specialist told him about the loss of fluid and the consequent loss of
22   vision admissible to defeat summary judgment.  Robertson Depo. at 92; see Orr v. Bank of
23   America, NT & SA, 285 F.3d 764, 779 (9th Cir. 2002)

24           Defendant Greenough is entitled to summary judgment.
25   /////
26   /////

1  VI. Plaintiff's Request For Additional Time For Discovery

2  Plaintiff seeks additional time in which to pursue discovery to support his motion
3  for summary judgment.

4  Rule 56(f) of the Federal Rules of Civil Procedure permits a court to deny or
5  continue determination of a motion for summary judgment "should it appear from the affidavits
6  of a party opposing the motion that the party cannot for reasons stated present by affidavit facts
7  essential to justify the party's opposition." The Ninth Circuit requires the affidavits to set forth
8  "the particular facts expected from the movant's discovery." Brae Transp., Inc. v. Coopers &
9  Lybrand, 790 F.2d 1439, 1443 (9th Cir. 1986).

10  In this case, plaintiff asks for more time in part to receive memos and other
11  discovery documents defendants acknowledge were created, but which they cannot find.   Pl.'s
12  Motion for Continuance, Exs. B, C.  He also seeks documents that relate to "organized inmate
13  protest" in ASU between January 1, 2000 and June 14, 2001 and the names of all the officers
14  who transported plaintiff on August 14, 2000. Id., Ex. A.

15  Counsel for defendants has a continuing duty to provide discovery. Fed. R. Civ.
16  P. 26(e). If the documents plaintiff seeks are unavailable, continuing resolution of these pending
17  motion to permit their discovery would be a futile act.

18  Moreover, plaintiff has not listed "the particular facts" he expects from the
19  additional discovery sought, but explains only in a conclusory fashion that he cannot oppose the
20  motion for summary judgment without these items.

21  IT IS HEREBY ORDERED that plaintiff's motion for a continuance to obtain
22  discovery (doc. 33) is denied.

23  IT IS HEREBY RECOMMENDED that the motion for summary judgment be
24  granted as to defendants Arthur, Greenough, Newland and Dickinson, but denied as to
25  defendants Rougeaux, Ledesma and Moser.

26  /////

1    These findings and recommendations are submitted to the United States District
2 Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fifteen
3 days after being served with these findings and recommendations, any party may file written
4 objections with the court and serve a copy on all parties.  Such a document should be captioned
5 "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections
6 shall be served and filed within five days after service of the objections.  The parties are advised
7 that failure to file objections within the specified time may waive the right to appeal the District
8 Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).
9 DATED: March 2, 2006.

_____
UNITED STATES MAGISTRATE JUDGE

16    2/robe1712.157